## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

In re

**RANDALL A. FRANZ**,

       Debtor.

Case No.  **10-61754-7**

**UNITED STATES TRUSTEE**,

       Plaintiff.

-vs-

**RANDALL A. FRANZ**,

       Defendant.

Adv No.  **15-00003**

# MEMORANDUM OF DECISION

At Butte in said District this 24th day of June, 2015.

In this adversary proceeding seeking to revoke the Defendant/Debtor's discharge pursuant to 11 U.S.C. § 727(d)(2), the Plaintiff United States Trustee ("Plaintiff" or "UST") filed a motion for summary judgment on May 23, 2015, together with a Statement of Uncontroverted Facts ("SOUF") and supporting memorandum. Defendant Randall A. Franz ("Franz" or "Debtor") filed a response on June 15, 2015. Trial of this adversary proceeding is set to commence on July 10, 2015. After review of the UST's SOUF, the UST's motion and memorandum, and Debtor's response, this Court finds and concludes that the UST failed its burden to show there are no genuine issues of material fact with respect to whether the Debtor fraudulently failed to report the

1

acquisition of or entitlement to property of the estate as required to revoke his discharge under §

727(d)(2).  Therefore, the UST's motion for summary judgment will be denied.

This Court has jurisdiction under 28 U.S.C. § 1334(b) as this adversary proceeding is

arising in and related to the above-captioned Chapter 7 bankruptcy case, in which a discharge of

the Debtor was entered on May 6, 2013.  A proceeding to revoke a debtor's discharge is a core

proceeding under 28 U.S.C. § 157(b)(2).  This Memorandum of Decision includes the Court's

findings of fact and conclusions of law under F.R.B.P. Rule 7052 (applying Fed. R. Civ. P. 52 in

adversary proceedings).

## FINDINGS OF FACT

Plaintiff filed a separate SOUF in support of its motion for summary judgment, as

required by Montana Local Bankruptcy Rule ("Mont. LBR") 7056-1(a)(1).  The SOUF,

Document No. 16, is accompanied by several exhibits including the transcript ("Tr.") of the

Debtor's Rule 2004 examination, and sets forth the following facts:

1. Franz commenced his bankruptcy case under chapter 11 on July 20, 2010 (Docket No. 1); and his case was converted to chapter 7 on January 17, 2013 (Dkt. No. 169).

2. Franz filed his original Schedules and Statement of Financial Affairs on August 3, 2010 (Docket No. 7), which he signed under penalty of perjury.

3. Following conversion of his case to chapter 7, Franz filed Amended Schedules on March 2, 2013 (Dkt. 176).

4. Mary Ann Franz ("Mary Ann") was Debtor's mother. (Tr. p. 14)

5. Mary Ann died on May 25, 2009, prior to the commencement of Franz's bankruptcy. (Tr. p. 15)

6. In her will Mary Ann left all of her assets in equal shares to her three sons (Franz and his two brothers, Brian and Lee Roy). (Tr. pp. 14-15, 21; and Tr.

2

Ex. 1)

7. On August 30, 2010, the chapter 11 meeting of creditors was commenced pursuant to 11 U.S.C. § 341, and Franz appeared with counsel and testified under oath. (Tr. p. 123; and Dkt. 5) Following conversion to chapter 7, a new § 341 meeting was conducted on March 4, 2013, where Franz again appeared with counsel and testified under oath. (Tr. p. 161; and Dkt. 172)

8. On January 17, 2013, Richard J. Samson was appointed as the trustee for Franz's chapter 7 bankruptcy case. (Dkt. 172)

9. Franz received a discharge on May 6, 2013. (Dkt. 181)

10. Franz took all of his inheritance from his mother's estate (and large parts of his brothers' shares) and used it for his own benefit and purposes without making his trustee, Samson, aware of such facts and without delivering or surrendering to Samson what remained of his share of his inheritance at the time of the conversion of his case to chapter 7. (See below)

II.   FACTS UNDERLYING THE ALLEGATIONS OF PLAINTIFF'S COMPLAINT

Following are the allegations taken directly from Plaintiff's Complaint (the numbered paragraphs match those of the Complaint), along with the relevant citations to Franz's Rule 2004 examination (and the Exhibits thereto) that serve to prove each allegation of the Complaint.

11. On or about May 25, 2009, Franz's mother, Mary Ann Franz, passed away (Tr. p. 15; Tr. Ex. 2) and according to her Last Will and Testament her estate was to be divided equally in three shares to her three sons, who were Defendant and his two brothers, Lee Roy Franz and Brian Robert Franz. (Tr. pp. 14 and 21; and Tr. Ex. 1)

12. In his original Schedule B filed at the time Defendant commenced his bankruptcy case under Chapter 11, in response to item 20 Franz disclosed he was entitled to a "1/3 beneficiary interest in estate of Mary Ann Franz" and valued his interest at $100,000. (Tr. p. 104; Dkt. 7, Schedule B, item no. 20)

13. On or about October 22, 2010, Defendant was appointed as the personal representative ("PR") of his mother's probate estate by the Superior Court of the State of Washington, in and for the County of Whitman, in cause number 09-4-000522-8. (Tr. p. 20; and Tr. Ex. 4)

3

14. Upon information and belief Plaintiff understands that Lee Roy Franz has mental health disabilities (Tr. pp. 17; 210; 226 and 231); and on or about June 22, 2009, a guardian ad litem was appointed on his behalf by the Superior Court of the State of Washington, in and for the County of Whitman, in cause number 09-4-000522-8. (Tr. p. 16-18; and Tr. Ex. 3)

15. According to the testimony of Defendant during his Rule 2004 examination which was conducted on December 15, 2014, Mary Ann Franz had funds in various bank accounts and other instruments at the time of her death totaling $48,572.77. (Tr. pp. 23-24 and 106-112; and Tr. Ex. 7)

16. According to the testimony of Defendant during his Rule 2004 examination, Mary Ann Franz owned three real properties upon her death, referred to by Defendant as (1) a vacant lot on a hillside near Park Street in Colfax, Washington; (2) the Franz Apartments, located next to the Congregational Church in Colfax; and (3) the Marcus Place Apartments on Lake Street in Colfax. (Tr. pp. 23; and Tr. Ex. 6)

17. On or about November 12, 2010, acting as the PR for his mother's probate estate, Defendant sold the vacant lot in Colfax for $4,000, and realized net cash from the sale in the amount of $3,990.98, which was deposited into the Mary Ann Franz probate estate account. (Tr. pp. 25-26; and Tr. Ex. 8)

18. On or about March 3, 2011, acting as the PR for his mother's probate estate, Franz sold the Franz Apartments for $35,000, and realized net cash from the sale in the amount of $31,367.82, which was deposited into the probate estate account. (Tr. pp. 27-29; and Tr. Ex. 9)

19. On or about June 27, 2013, acting as the PR for his mother's probate estate, Defendant sold the Marcus Place Apartments for $640,000, and realized net cash from the sale after the payment of all liens and encumbrances and other costs of sale in the amount of $382,650.39, which was deposited into the probate estate account. (Tr. pp. 29-32 and 157; and Tr. Ex. 10) This was in addition to the $10,000 earnest money Defendant received in connection with the sale of the Marcus Place Apartments, which brought the total net cash realized to $392,650.39. (Tr. pp. 157 and 269; and Tr. Ex. 10)

20. When the Marcus Place Apartments were sold on June 27, 2013 (three months following Defendant's § 341 creditors' meeting), Defendant took the $48,862.55 that was in the reserve account established for the apartment building and kept it for his own personal use and benefit. (Tr. pp. 32-33; 136-137; 163-167; and Tr. Ex. 22 and 23) Defendant did not disclose the sale of the Marcus Place Apartments or his receipt and expenditure of the sale proceeds or the reserve

4

account funds to the Chapter 7 bankruptcy trustee, and did not deliver or surrender any of the same to the trustee. (Tr. p. 162) Defendant alleged in his Rule 2004 examination that he took these funds as a real estate commission for assisting in the sale of the Marcus Place Apartments, but he had no authority to do so, did not have a listing agreement, did not make the real estate agency for which he worked in Idaho aware of this sale or his commission, and was not licensed as a realtor in the State of Washington at the time of the sale of this Washington property. (Tr. pp. 32-33 and 170-174)

21. Of the funds realized from the assets in Mary Ann Franz's estate, $7,500 was distributed by Defendant to his brother Brian Franz in 2010 and 2011 (Tr. pp. 140-141; 148; 153-154 and 264) which was later followed up by a $90,000 wire transfer initiated by Defendant from Mary Ann Franz's estate account to Brian Franz on July 5, 2013 (Tr. pp. 45-46; 59; 125 and 265; and Tr. Ex. 15); and additional funds were used by Defendant to pay Brian Franz's $1,040 credit card bill with Sears Roebuck. (Tr. pp. 54-55)

22. After his bankruptcy case was converted from Chapter 11 to Chapter 7, Defendant began to take large amounts of funds from Mary Ann Franz's estate account for his own use and benefit, or to place into Selkirk Development LLC, or for gifts to his wife and children, on the rationale that such funds constituted his third of his mother's probate estate. (Tr. pp. 38; 43-44; 50-60; 70-98; and 197-198)

23. On or about July 11, 2013 (after the conversion of his bankruptcy case to Chapter 7), Defendant caused a wire transfer of funds from the Mary Ann Franz estate account into the account of Selkirk Development LLC in the amount of $30,000, which he alleged in his Rule 2004 examination was a part of his one-third share of his inheritance from his mother. (Tr. pp. 38; 41-42; 180-182; 194-199; and Tr. Ex. 13, 25, 26, 28) Defendant used such funds to repay debts owed to relatives and others, without disclosing the existence of these funds, the wire transfer, or his personal use of such funds to the Chapter 7 bankruptcy trustee; and he did not deliver or surrender any portion of these funds to the trustee. (Tr. pp. 196-199)

24. Significant amounts of money were taken by Defendant from the estate account of Mary Ann Franz for his personal use and benefit, to include a check mailed to Mike Northquest for $60,000 in July of 2013 (after the conversion of his bankruptcy case to Chapter 7) to repay Mr. Northquest for funds borrowed by Defendant in the summer of 2009 and the spring of 2010 prior to the commencement of Defendant's bankruptcy case. (Tr. pp. 60-64; and Tr. Ex. 15, check no. 519, dated 7/2/13) Mr. Northquest was Defendant's wife's cousin. (Tr. p. 62) Although Defendant admitted this $60,000 was a part of his one-third share of

his inheritance from his mother during his Rule 2004 examination, his payment of such funds to Mr. Northquest was not disclosed to the Chapter 7 bankruptcy trustee. (Tr. pp. 61-64; 66; 236 and 250)

25. When Defendant filed his original bankruptcy Schedules on August 3, 2010, he did not list Mike Northquest as a creditor owed monies for prepetition loans made to allow Defendant to finish his subdivision project. (Tr. pp. 61; 66) Defendant also did not list Mr. Northquest as a creditor when he filed his Amended Schedules on March 2, 2013, following the conversion of his bankruptcy case to Chapter 7. (Dkt. 176)

26. On August 30, 2013 (after the conversion of his bankruptcy case to Chapter 7), as PR for his mother's probate estate, Defendant made a loan to All Seasons, LLC (owned by Paula Kamp) for $60,000, pursuant to which All Seasons was to pay interest only at the rate of $500 per month with a balloon payment on its maturity date. (Tr. pp. 75-76 and 128-132; and Tr. Ex. 15, check no. 521, dated 8/30/13) Originally it was to be a one year loan but when All Seasons was unable to repay the same on September 1, 2014, it was "rolled over" by Defendant acting as PR for a second year. (Tr. pp. 76-77 and 129) Defendant is employed by All Seasons, LLC, and Paula Kamp is his boss. (Tr. p. 76 and 128-129)

27. The following is a summary of all of the transactions from Mary Ann Franz's estate account located at American West Bank (all of which transactions took place after the conversion of Defendant's bankruptcy to Chapter 7 on January 17, 2013, and after the § 341 creditors' meeting which occurred on March 4, 2013, without the knowledge of the Chapter 7 bankruptcy trustee): (Tr. Exs. 15 and 16, identified on pp. 47-49. All references as to "purpose" are taken from Franz's 2004 examination transcript)

[List of transactions totaling $378,895.86 – "Should actually be $376,895.86." Doc. 16 [pp. 7– 10]

28. The total amount of funds that Defendant took from the Mary Ann Franz probate estate account at American West Bank for his own personal use and benefit, or for gifts to family members (not counting the $90,000 wired to Brian Franz or the $1,040 used to pay off Brian Franz' Sears credit card debt), is $287,855.86 [which amount should have been $280,855.86 given the $2,000 reduction noted in paragraph 27 above, as well as a reduction for the $5,000 short term loan Franz made to his employer – check no. 534 – which was repaid a month later – Tr. pp. 87-88], which left only $31,035.43 in his mother's estate account as of November, 2014. (Tr. p. 97; and Tr. Ex. 15)

6

29. On or about December 15, 2014, Defendant transferred $25,000 of the remaining balance in the Mary Ann Franz estate account to his attorney, Quentin Rhoades, to be held in trust until a judicial determination can be made as to the proper owner of such funds; but prior to doing so, and after making a $5,000 retainer payment to his attorney Mr. Rhoades, Defendant took an additional $6,000 from the funds remaining in his mother's estate account for his own personal use and benefit. (Tr. pp. 97-98)

30. The $48,572.77 Defendant collected from his mother's various financial accounts and instruments, referred to in paragraph 15 above, comprised the opening balance of an estate account at the Bank of Whitman in Colfax, Washington, which was deposited on June 11, 2009. (Tr. pp. 23-24; and Tr. Ex. 21) Prior to taking monies from his mother's estate account referenced in paragraph 27 above, Defendant also took funds for his own personal use from the Bank of Whitman account. (Tr. pp. 118-119) During his Rule 2004 examination Defendant alleged that such monies totaled approximately $55,260.82 (Tr. pp. 40-41; 115 and 151; and Tr. Ex. 20); however, it appears only the following withdrawals from said account can be attributed to Defendant's use and benefit or gifts to his family members: (See Tr. p. 133 and the pages referenced for each check or transaction; and Tr. Ex. 20 and 21)

[More transactions by Debtor listed totaling $42,126.50; Doc. 16, pp. 11-13]

[Franz testified that he spent between $20,000 and $30,000 paying for his mother's funeral and other final debts from this account. Tr. pp. 40; 113-114]

31. While his bankruptcy case was in Chapter 11, Defendant filed Monthly Operating Reports with the Court in which he was required to disclose, under penalty of perjury, that the information contained therein was complete, true and correct to the best of his knowledge, information and belief. The following information was contained in such Monthly Operating Reports for the noted months:

[list of distributions from mother's estate totaling $15,300 from MORs; Doc. 16, p. 13]

Defendant was in Chapter 11 from July 20, 2010, through January 17, 2013, when he converted his case to Chapter 7. (Dkt. 1 and 170) Of the $31,466.61 that Defendant took for his own use and benefit during his Chapter 11, he only reported $15,300 in his Chapter 11 Monthly Operating Reports. (See paragraph 30 above)

32. Defendant's brother, Brian Franz, received $7,500 from the Bank of

Whitman estate account in the following checks written by Defendant: No. 1046, in the amount of $2,500, on 02/09/2010; and No. 1092, in the amount of $5,000, on March 28, 2011, which allegedly represented a portion of his one-third share of his mother's inheritance. (Tr. pp. 153-154; and Tr. Ex. 20 and 21) These funds, in addition to the $90,000 Defendant wired to Brian Franz on July 2, 2013 (Tr. pp. 44-46; 59; 265; and Tr. Exs. 14 and 16), and the $1,040 Defendant paid on Brian Franz' Sears card on May 12, 2013 (Tr. pp. 54; 266; and Tr. Ex. 15), reveal that Brian Franz received $98,540 (Tr. p. 266) of his one-third share of his inheritance from his mother. Although personally taking and spending more than his own one-third share of his inheritance from his mother, Defendant, as PR for his mother's probate estate, has never paid anything to his disabled brother, Lee Roy Franz, for his one-third share of his inheritance. (Tr. pp. 73-74; 125-127; 131-132; 209-212; 223-226 and 264-265)

33. Defendant did not disclose the monies he had taken from his mother's estate account in response to Question 2 of the Statement of Financial Affairs he filed on August 3, 2010, in the context of his Chapter 11 bankruptcy case which required him to state the amount of income he received other than from employment, trade, profession, or operation of his business, during the two years immediately preceding the commencement of his bankruptcy. (Dkt. 7) From Defendant's own records it can be confirmed that he took at least $10,659.89 from his mother's probate estate for his own use and benefit between the date of her death on May 25, 2009, and the date he commenced his bankruptcy case on July 20, 2010 [see paragraph 30 above], which monies were not disclosed in Defendant's Statement of Financial Affairs. (Dkt. 7)

34. At the § 341 creditors' meeting conducted by Chapter 7 trustee Richard Samson on March 4, 2013, Defendant did not disclose that he was possessed of a buy-sell agreement signed in June of 2012 for the sale of the Marcus Place Apartments and that he was about to close on such sale three months later on June 27, 2013, despite being specifically asked about such matters by the trustee. (Tr. pp. 11-12; 30-31; 162; 226-227; 230 and 233)

35. At the § 341 creditors' meeting and in a number of subsequent emails, the Chapter 7 trustee repeatedly instructed Defendant to keep him informed of the status of the Mary Ann Franz probate and the sale of the Marcus Place Apartments (Tr. pp. 11-12; 30-31; 162; 226-227; 230 and 233; and Tr. Exs. 33-37), but Defendant sold the building (Tr. Ex. 10), took the reserve account (Tr. pp. 32-33; 136-137; 163-167; and Tr. Exs. 22 and 23), and used the proceeds for his own use and benefit without ever disclosing anything to the trustee about the sale, or the proceeds and their disposition. (Tr. pp. 162-167)

36. Defendant did not list Janice Stamness and Perry Stamness as creditors

in either his original bankruptcy Schedules (Dkt. 7) or in his Amended Schedules filed after his bankruptcy was converted to Chapter 7 (Dkt. 176), even though they lent him $13,700 and $1,500 to bail himself out of jail in 2010 before he filed his bankruptcy case (Tr. pp. 41-43 and 189-195); and he did not disclose to the Chapter 7 trustee that he took money out of the Selkirk Development LLC bank account in July of 2013 to repay these creditors (Tr. pp. 196-197).

37. Defendant did not disclose his purchase of a 2001 GMC pickup on or about January 17, 2014, for $10,000 with funds taken from the Mary Ann Franz estate, and he did not deliver or surrender such vehicle to his Chapter 7 bankruptcy trustee. (Tr. pp. 57; and 82-83)

38. Defendant did not disclose his ownership of a 2001 Nissan Pathfinder in either his original bankruptcy schedules or in his Amended Schedules, and did not deliver or surrender such vehicle to his Chapter 7 bankruptcy trustee. (Tr. pp. 92, 96)

39. Although Defendant has taken and spent large portions of the one-third shares of each of his brothers, Brian Franz and Lee Roy Franz, these individuals were never listed as creditors in his bankruptcy (Dkt. 7), even when he filed an amended Schedule F on March 2, 2013, reflecting new general unsecured creditors whose claims arose during the period of time dating from the commencement of the Chapter 11 case through the date of conversion to Chapter 7 (Dkt. 176). During his Rule 2004 examination Defendant admitted he owed his brothers for the monies he has taken and spent from their shares of their mother's inheritance. (Tr. pp. 240-241)

40. Upon information and belief Plaintiff alleges that the probate estate of Mary Ann Franz contained assets worth at least $525,444.51, calculated as follows:

[Detail of probate estate; Doc. 16, p. 16]

III. FACTS ESTABLISHING FRANZ TOOK BANKRUPTCY ESTATE ASSETS FOR HIS OWN USE AND BENEFIT AFTER CONVERSION OF HIS CASE TO CHAPTER 7

The following facts are in addition to those cited above under paragraphs 20, 22, 23, 24, 27, 28, 29, 35, 36 and 37.

41. Franz acknowledged he knew after his case converted to chapter 7 that his one-third share of his mother's inheritance was property of his bankruptcy estate (Tr. p. 122):

> Q [Jensen] You acknowledge, do you not, that your one-third interest in your mother's estate was property of your bankruptcy estate from the day you filed bankruptcy in July of 2010?
>
> A I guess that's my misunderstanding. I didn't understand that that was – until we got into the liquidation of the Chapter 7 bankruptcy, then that was conveyed to me.[]

[See also Franz's original Schedule B (Dkt. 7) and Amended Schedule B (Dkt. 176), which both listed his inheritance as an asset of his bankruptcy estate]

42. Franz admitted he took and used money from his one-third of his mother's inheritance after he filed his bankruptcy (Tr. p. 119). He also admitted he knew that after his case was converted to chapter 7 he was required to turn over any monies he received to his bankruptcy trustee (Tr. pp. 120-121):

> Q [Jensen] So is it your thinking that you can just take as much money out of the estate and get it down to zero in order to avoid turning anything over to your bankruptcy trustee?
>
> A That is – no, that is not my understanding.
>
> Q I am trying to understand what you are saying to me. You say that you were informed that any monies that you received after the case converted to Chapter 7 would have to be turned over to your bankruptcy trustee. Correct?
>
> A I was told that in 2013, yes.
>
> Q When your case converted, in January of 2013?
>
> A Yes.

43. Franz acknowledged that he continued to take money from his mother's estate: "But it did continue. I mean, I was broke. I was homeless. I had no money to do anything. Everything I owned was tied up in the bankruptcy." (Tr. p. 122)

44. Franz agreed that he and each of his brothers was entitled to one-third of the $382,650.39 net proceeds from the sale of the Marcus Place Apartments that occurred after his case was converted to chapter 7, which divided by three came to $127,550.13 (Tr. pp. 36 and 45; Tr. Ex. 10). [This does not include the $10,000 earnest money deposit, which increased the actual net proceeds from

$382,650.39 to $392,650.39, and which, when divided by three, comes to $130,883.46 for each brother. – Tr. pp. 157 and 269; and Tr. Ex. 10]

45. Franz admitted he took more than his own one-third share of his mother's estate and acknowledged he would have to repay his brothers and his bankruptcy estate somehow (Tr. pp. 183-184) (see also Tr. pp. 206 and 271-272):

> Q [Jensen] If you steal money from someone while you are in bankruptcy, is it your understanding that you get to keep that money?
>
> A It was always considered to be more of a borrowing than –
>
> Q As a personal representative, again, as a fiduciary, do you understand that you can't just unilaterally borrow money any time you think you need some extra cash?
>
> A That's not – that wasn't what the intent was, so – but if you put it that way, I guess that's – I don't know what I am supposed to say to that.
>
> Q What was your intent? You have no ability to repay this money that you have taken, that didn't belong to you, that you have given away, that you have loaned, that you have taken and you have spent and you have gifted. Where is this money going to come from to reimburse this probate estate that you are acting as a personal representative for? Huh? Where is this money going to come from?
>
> A I am just going to have to repay it.
>
> Q How? You are broke. Right? Destitute. Right? Still taking money from this piggy bank. Correct?
>
> A I guess, yeah.

46. Franz admitted taking a final $6,000 from his mother's estate account for his own use between the initial date set for of his Rule 2004 examination and the date his examination was actually conducted. (Tr. p. 185):

> Q [Jensen] So you just cleaned out the account, essentially? Took the last $6,000. And I assume you have spent it?
>
> A Yes.

11

Q What did you spend it on?

A Paid my bills.

47. Franz admitted using his mother's estate account as his own private piggy bank (Tr. p. 186):

Q [Jensen] Sir, from where I sit, it looks like you used this estate account as your own private piggy bank, that whenever you needed money, you just took it. When you wanted to loan money to a friend, you just lent it. Do you dispute that?

A No.

48. Franz admitted he did not make Samson aware of the $60,000 he spent of his inheritance by paying his debt to Mr. Northquest. (Tr. p. 236) And he also made a $60,000 loan to his employer, Remax, which is doubtful of repayment (Tr. pp. 75-78 and 214-216); and he purchased a note and trust indenture from a client for $17,175 (Tr. pp. 70-78 and 209-212).

49. Franz admitted the $60,000 lent to him by Mike Northquest (his then wife's cousin – Tr. p. 62) occurred before his bankruptcy was filed (Tr. p. 202-207), and Franz repaid him the money on July 2, 2013, after his case was converted to chapter 7. (Tr. p. 207; 259) Franz admitted he considered the $60,000 that he repaid to Mr. Northquest to be part of his one-third inheritance. (Tr. p. 209; 250)

Q [Jensen] Well, there was $60,000 left after you converted to Chapter 7 that you took and sent to pay one of your bills.
A I had already borrowed that money and agreed to repay it back from the sales.
Q Yes, but you borrowed it. You borrowed it. It was your money owing. You took money that didn't belong to you. You took your inheritance -- after your bankruptcy was converted to a 7, you took that money and you sent it off to pay a creditor of yours without telling Mr. Samson.
A The commitment was made prior to the filing in the bankruptcy.
Q All your bills were committed – all your creditors were commitments prior to the bankruptcy. They didn't get paid any money. You singled out one creditor and sent him $60,000. The rest of these creditors didn't get paid any money.
A That was the arrangement I made with Mr. Northquest. Mr. Northquest provided the engineering funding needed to try to get

the subdivision done. And because I couldn't pay the quarterly trustee's fees, it got kicked into a 7; and I lost a half-a-million dollar property that Mr. Doyle is now using my engineering to subdivide the property and laughing all the way to the bank. (Tr. pp. 259-260)

50. Franz admitted Mr. Northquest was not a creditor of his mother's estate but was Franz's own creditor. (Tr. p. 252)

51. Franz admitted the funds in the Selkirk Development LLC bank account was Franz's money. This Selkirk account was used by Franz because it was his only account, with the exception of his deceased mother's estate account. He used these funds to pay his prepetition debts to Janice Stamness (Franz's mother-in-law) and Perry Stamness (Franz's brother-in-law) in the amount of $15,200. (Tr. pp. 41-44, 68-69, 189-195)

IV. FACTS ESTABLISHING FRANZ KEPT TRUSTEE SAMSON AND EVERYONE ELSE IN THE DARK ABOUT HIS USE OF BANKRUPTCY ESTATE ASSETS

The following facts are in addition to those cited above under paragraphs 20, 23, 24, 27, 34, 35 and 36.

52. At the chapter 11 § 341 meeting Samson asked Franz to keep him "informed and advised as to the status of the Marcus Place apartments," and also asked him to keep him "advised of any potential sales and to keep me [Samson] advised of any progress in that regard." (Tr. p. 12)

53. Franz admitted he did not tell Samson at the chapter 7 § 341 meeting held on March 4, 2013, that he had a buy-sell agreement on the Marcus Place Apartments and that he was about ready to close on such sale at that time. (Tr. pp. 226-227)

54. Franz admitted he never informed Samson of the pending or final sale of the Marcus Place Apartments (Tr. p. 162):

Q [Jensen] So did you ever inform Samson, your Chapter 7 trustee, that this sale was pending? That you had the property – you had signed a buy-sell agreement in June of 2012 and you were getting ready to close it?

A No.

55. At Franz's 2004 exam on December 15, 2014, Samson asked Franz why,

13

during the chapter 7 § 341 meeting held in March of 2013, Franz did not communicate with Samson that the Marcus Place Apartments were in the process of being sold, to which Franz replied: "I don't have an answer for that. I don't know." (Tr. p. 31) When Samson asked: "Is there a reason why, a year ago, when I was communicating with you by E-mail, that you didn't tell me, yes, the property has sold?" Franz replied: "The – it was my understanding that the – my share was what you were interested in; and so, no, we – there is no reason that that wasn't communicated to you. Probably should have been, in hindsight." (Tr. p. 31).

56. During the chapter 7 § 341 meeting, Samson instructed Franz: "Well, coming back to the estate, I just want to make it clear that any money that you have now, that you are entitled to receive, probably needs to come to me." Franz replied: "Okay." Samson then reemphasized: "What I need you to do is, I need you to keep me posted as to the status of the estate." To which Franz replied "Okay" and "Yeah." Then Samson noted that because Franz was the PR of his mother's estate, and "the guy that's in control": "So I want to make it clear that you need to keep me posted as far as any developments." During which statement Franz relied "Yeah." (Tr. p. 230)

57. During the chapter 7 § 341 meeting, Samson asked again of Franz: "Okay. So you are going to keep me posted for sure on that probate estate. Right?" To which Franz replied: "Yeah. Yeah. If that sale moves forward, I will." (Tr. p. 233) And even later during the § 341 Samson again tells Franz: "And just keep me posted on that estate and what the progress -- ." To which Franz replied: "Yeah." (Tr. p. 233) During Franz's Rule 2004 examination the following Q and A occurred:

Q [Jensen] So I count a number of times in that [§ 341] transcript where you were told by your trustee to keep him in the loop, to keep him informed of the status of the sale of that property. Did you do that?

A No.

58. Franz was asked if he ever told Samson the Marcus Place Apartments had been sold, and he acknowledged he had not (Tr. p. 244):

Q [Jensen – reading from Samson's October 24, 2013, email to Franz – Tr. Ex. 34) "My questions are very straightforward. One, what is the current value of the real property in your mother's estate? Two, what amount, if any, is owned against the real property? Three, is the property currently generating any income; and, if so, how much per month, gross and net? Four, if the property has produced income, what has happened to the net proceeds? Five, I was told by Mr. Libey [the probate attorney in

14

Washington] that the property is no longer listed for sale. If that is accurate, why is it not listed for sale? Six, at your creditor meeting, you mentioned that there was a potential sale in the works. What happened to that buyer?" [Jensen] Did you ever write him back or call him or notify him and tell him, "Mr. Samson, the property has been sold"?

A No, I guess not. No.

Franz did not inform Samson he had sold the Marcus Place Apartments, and has not to this date turned over any monies or other assets to Samson. (See Samson's Affidavit, attached as Exhibit C)

59. Franz admitted that the probate judge assigned to his mother's estate had no knowledge he was taking and using most of the assets for his own benefit (Tr. p. 128):

Q [Jensen] Is the probate judge aware that you have sold all of your mother's assets and that you have spent most of them?

A I have not spoken to the probate judge, no.

Q By that, I want to know if anything has been filed with the judge that would alert him to the fact that the estate has been liquidated and substantial monies have been taken by you personally?

A No, nothing has been filed.

60. Franz admitted he did not inform the probate court or even the attorney who was handling his mother's probate estate for which he was PR that he had taken the $48,862.55 from the Marcus Place Apartments account for his own use and benefit. (Tr. pp. 168-169)

61. Franz admitted he told no one except his brother Brian about the fact he took and spent for his own personal use and benefit the $48,862.55 that was in the reserve account for the Marcus Place Apartments (Tr. pp. 166-169):

Q [Jensen] Did you get anyone's approval before you just took this $50,000?

A I discussed it with my brother Brian, yes.

Q You talked to your brother Brian; and your brother Brian said, "Go ahead and take the $48,862"?

15

A Um-hum.

Q Yes?

A Yes.

Q Did you talk to your other brother, Lee?

A I wasn't able to talk to him.

Q Did you talk to his care-givers, those people that were providing him care, taking care of him?

A No.

Q Did you talk to the probate judge?

A No.

Q Pardon?

A No.

Q Did you talk – at this point in time, the estate was represented by counsel. Did you talk to counsel for the probate estate?

A No.

Q Was counsel for the probate estate even aware that you took this $48,000 that was left over in the reserve account?

A No.

62. Franz admitted he did not make his disabled brother Lee Roy's guardian ad litem aware of the fact he was spending Lee Roy's share of their mother's inheritance, and had not even spoken to her since the fall of 2009. (Tr. p. 223-225)

Q [Jensen] So you never asked her – informed her about what you are doing with her ward's money, with your brother's one-third of the inheritance?

A No.

16

Q You have never contacted her to say, "I am spending this money. Maybe you should be aware of it"?

A No.

Q "I am taking this money that belongs to my brother and I am investing it. I am loaning it to friends of mine. I am buying trust indentures"? You never asked her whether that was acceptable to her ward, have you?

A No.

63. Franz admitted Selkirk Development LLC may have been defunct when his case converted to chapter 7, but in any event he was the sole member of the LLC, and he admitted he did not make Samson aware he had money in the LLC's bank account and that he was using this account (Tr. pp. 178-180):

Q [Jensen] No, at this point in time, you are in a Chapter 7 case and all of your assets belong to Mr. – the trustee Dick Samson is in charge of all of the assets of the bankruptcy estate, including anything that is in the name of Selkirk Development, LLC.

A Okay.

Q Did you make Mr. Samson aware that there was $1,000 sitting in this bank account?

A No.

64. Franz admitted that the $30,000 he wire transferred from his mother's estate account to the Selkirk Development LLC account on July 11, 2013, was a part of his one-third inheritance, and that he did not disclose these funds to Samson or turn them over to Samson (Tr. p. 196-197):

Q [Jensen] Here is my question, which you have ignored. Do you admit that the $30,000 that you transferred from your mother's probate account into the Selkirk Development account on July 11, 2013, was supposed to be, in your mind, part of your inheritance, your one-third inheritance?

A Yes.

Q Thank you. And why, again, did you not inform your trustee – you were in bankruptcy now, in Chapter 7 bankruptcy, by the time you make this transfer into the Selkirk Development, LLC, account. Why do you not tell

17

your bankruptcy trustee about this inheritance, this one-third inheritance, that you still had some money owing to you at the time? In other words, you admit that your inheritance, your one-third, which you have listed twice now in your bankruptcy schedules, is an asset of this bankruptcy estate. Why then did you not take the $30,000 and give it to Mr. Samson, as opposed to putting it into Selkirk Development's account where you promptly diminished it?

A I don't know how to answer that, other than I thought, you know, things would work out differently than they did; but it didn't work out that way.

Q Exhibit 25 goes from 30,000 plus $1,000 that you deposited when it was overdraft, say $31,000, it goes down to an ending balance November of '14 of $187.64. Do you admit that all of the money that went into this account, 30,000 and the 1,000 that came from your mother's estate, you spent it on yourself or your family members for personal affairs?

A Yes. I squared up and paid the loans back that I had, and then the rest of it was spent on –

Q Paid your bills?

A Yes.

Q Yes. Correct?

A There was some of the bankruptcy stuff for the moving and other things that the money went for; but, yes, it was – it was trying to implement the plan and get moved out of Montana.

Q The plan was long since over by this point in time. You are in Chapter 7.

A Yes. Yes. Having to move with no money, it – trying not to get shot by the neighbor, and I'm ducking bullets. I mean, I am still scared to go to Heron, Montana, for fear that I am going to get shot.

Q But you knowingly took money that didn't belong to you, your one-third inheritance, and spent it, instead of giving it to your bankruptcy trustee after your conversion to Chapter 7? Fair statement?

A Yes. It was my mistake, yes.

18

65. Franz admitted he did not make Samson aware of the $60,000 he spent of his inheritance by paying his debt to Mr. Northquest. (Tr. p. 236)

66. Franz admitted even as late as September of 2014, he had not told Samson what was happening with regard to his mother's estate (Tr. p. 257):

Q [Jensen – reading from Samson's email to Franz on Sept. 23, 2014 – Tr. Ex. 37] "Mr. Franz, before I put this matter in front of the court and require your attendance at a deposition, I would ask that you communicate with me prior to the end of this week. My address, phone number, and E-mail address are below. Thank you." [Jensen] He is again searching for information with regard to your mother's probate estate, which you have failed to give him; and now this is September, just a couple of months ago. He is still asking, "Tell me what is going on with regard to your mother's estate."

A I understand

Q And you are not telling him anything. Right?

A Yes.

* * * *

Q Why don't you cooperate with his requests by telling him that the property has been sold and you took the money and you spent it? This is two months ago. It is now – it is three months ago. It is September of 2014. And you are still telling him nothing in response to his requests about what is going on with the probate. You are still telling him nothing.

A Yes.

SOUF, Doc. 16.

Mont. LBR 7056-1(a)(2) requires that opposition to a summary judgment must be filed within 14 days, and provides that an opposing party must file a separately identified, short, and concise "Statement of Genuine Issues" setting forth the specific facts which the opposing party asserts establish a genuine issue of material fact precluding summary judgment.  Franz filed his response on June 15, 2015, more than 14 days after the UST filed its motion and SOUF on May

23, 2015.

Franz is pro se in this case, and courts have a duty to construe pro se pleadings liberally. *Bernhardt v. Los Angeles Cnty.*, 339 F.3d 920, 925 (9th Cir. 2003); *see Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). Nonetheless, even pro se litigants must follow procedural rules. *See Clinton v. Deutsche Bank Nat'l Trust Co. (In re Clinton)*, 449 B.R. 79, 83 (9th Cir. BAP 2011); *see also Briones v. Riviera Hotel & Casino*, 116 F.3d 379, 382 (9th Cir. 1997) (stating that "pro se litigants are not excused from following court rules.").

In addition to Franz's tardy response, he did not file in his response a "Statement of Genuine Issues" setting forth specific facts which he asserts establish a genuine issue of material fact precluding summary judgment as required by LBR 7056-1(a)(2). His response to the UST's motion (Doc. 19) includes a list of twenty numbered "Background Facts" in which he admits that he "had taken draws out against his beneficial interest in the estate." Rather than setting forth specific facts which he asserts preclude summary judgment in favor of the UST, Franz's response blames his divorce, his attorneys, his creditors, the Trustee, the UST, the probate court, and his neighbors for the problems with this case.

Mont. LBR 7056-1(a)(3) provides:

> **Facts Admitted.** All material facts in the moving party's Statement of Uncontroverted Facts are deemed to be admitted unless controverted by a Statement of Genuine Issues filed by the opposing party.

Construing the pro se Defendant's response liberally as it must, this Court finds that it does not set forth specific facts establishing a genuine issue of material fact precluding summary judgment in favor the moving party, with one exception discussed below relating to fraudulent intent.

20

Franz accuses the Trustee and UST of violating his civil rights, violating the discharge injunction and using illegally obtained information to try and pressure the Debtor to stipulate to revocation of his discharge; he refers to circumstances relating to the Washington probate action, Idaho divorce and wife's bankruptcy proceedings.  But as far as the 66 numbered uncontroverted facts contained in the UST's SOUF, Franz's response does not state specific facts which establish a genuine issue of material fact as to any of them.  Therefore, by operation of Mont. LBR 7056-1(a)(3), the Court deems all material facts in the UST's SOUF to be admitted based upon Franz's failure to controvert them by a Statement of Genuine Issues.

## DISCUSSION

### I.  Summary Judgment Standards.

Summary judgment is governed by F.R.B.P. 7056.  Rule 7056, incorporating Rule 56©, Fed. R. Civ. P., states that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  "The proponent of a summary judgment motion bears a heavy burden to show that there are no disputed facts warranting disposition of the case on the law without trial." *Younie v. Gonya (In re Younie)*, 211 B.R. 367, 373 (9th Cir. BAP 1997) (*quoting In re Aquaslide "N" Dive Corp.*, 85 B.R. 545, 547 (9th Cir. BAP 1987)).  Once that burden has been met, "the opponent must affirmatively show that a material issue of fact remains in dispute." *Frederick S. Wyle P.C. v. Texaco, Inc.*, 764 F.2d 604, 608 (9th Cir.1985).  That is, the opponent cannot assert the "mere existence of some alleged factual dispute between the parties." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2510, 91

L.Ed.2d 202 (1986).  Instead, to demonstrate that a genuine factual issue exists, the objector must produce affidavits which are based on personal knowledge and the facts set forth therein must be admissible in evidence.  *Aquaslide*, 85 B.R. at 547.

The moving party must initially identify those portions of the record before the Court which it believes establish an absence of material fact.  *T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Ass'n.*, 809 F.2d 626, 630 (9th Cir. 1987).  If the moving party adequately carries its burden, the party opposing summary judgment must then "set forth specific facts showing that there is a genuine issue for trial." *Kaiser Cement Corp. v. Fischback & Moore, Inc.*, 793 F.2d 1100, 1103-04 (9th Cir. 1986), *cert. denied*, 469 U.S. 949 (1986).

If a rational trier of fact might resolve disputes raised during summary judgment proceedings in favor of the nonmoving party, summary judgment must be denied.  *T.W. Elec. Serv.*, 809 F.2d at 630; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 202 (1986).  Thus, the Court's ultimate inquiry is to determine whether the "specific facts" set forth by the nonmoving party, viewed along with the undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence.  *T.W. Elec. Serv.*, 809 F.2d at 631.

Applying the above standards in the instant case, all material facts in the UST's SOUF are deemed admitted under Mont. LBR 7056-1(a)(3), and the analysis turns to application of those facts to Plaintiff's complaint for revocation of discharge under § 727(d)(2).

## II.  § 727(d)(2) – Failure to Deliver or Surrender Property of the Estate.

Section 727(d)(2) provides in pertinent part that a court "shall revoke a discharge granted under subsection (a) of this section if – . . . (2) the debtor acquired property that is

property of the estate, or became entitled to acquire property that would be property of the estate, and knowingly and fraudulently failed to report the acquisition of or entitlement to such property, or to deliver or surrender such property to the trustee . . . ." Under § 727(d)(2), the UST must prove (1) that Debtor acquired property of the bankruptcy estate and (2) that he knowingly and fraudulently failed to report or deliver such property to Trustee. *In re Romaine*, 2012 WL 768173, *3 (Bankr. D. Idaho 2012); *Krommenhoek v. Covino (In re Covino)*, 99.4 IBCR 138, 139 (Bankr .D.Idaho 1999) (citing *Bowman v. Belt Valley Bank (In re Bowman)*, 14 Mont. B.R. 79, 85-86, 173 B.R. 922, 925–26 (9th Cir. BAP 1994)).

The UST, as the plaintiff in this adversary proceeding, bears the burden of proof and must establish all elements by a preponderance of the evidence. *Id.*; F.R.B.P. Rule 4005; *In re Covino*, 99.4 IBCR at 139. Section 727(d)(2) must be construed liberally in favor of the Debtor, and strictly against the party objecting to discharge. *Id.*; *In re Covino*, 99.4 IBCR at 140 (citing *First Beverly Bank v. Adeeb (In re Adeeb)*, 787 F.2d 1339,1342 (9th Cir.1986)).

In *Bowman* the BAP reversed this Court's revocation of a debtor's discharge under § 727(d)(2) because there was no evidence, nor even any allegation in the complaint, that the debtor failed to report any acquisition of property to the trustee. 14 Mont. B.R. at 86; 173 B.R. at 926. The BAP wrote: "Both elements must be met and the plaintiff must prove that the debtor acted with knowing intent to defraud." *Bowman*, 14 Mont. B.R. at 85, 173 B.R. at 925. The instant complaint does not suffer from the same lack of allegation in the complaint, as in *Bowman,* that the Debtor failed to report to the Trustee acquisition of property. Paragraphs 34, 36, 37, 38, 42, and 43 of the complaint specifically allege that Franz failed to report acquisitions of property of the estate to the Trustee.

23

In addition, the above-quoted uncontroverted facts from the UST's SOUF state that Debtor acquired various items and sums which are or became property of the bankruptcy estate and that he knowingly failed to report or deliver such property to Trustee.  In particular, the facts in the SOUF enumerated Nos. 10, 20, 22, 23, 24, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 41, 42, 43, 44, 45, 46, 47, 48, 49, 51, 56, 57, 58, 59, 60, 61, 63, 64 and 65 each contains uncontroverted allegations that Franz acquired or became entitled to acquire property that was property of the estate, that he knowingly failed to report the acquisition of or entitlement to such property, or to deliver such property to the Trustee.  Doc. 16.  The first "Background Fact" listed in Franz's response, Doc. 18, confirms that he "had taken draws out against his beneficial interest in the estate."

Turning to the "fraudulently" part of "knowingly and fraudulently," the same phrase is found under 727(a)(4), under which a discharge may be denied if a plaintiff shows that the debtor "knowingly and fraudulently" made a false oath.  *Fogal Legware of Switzerland, Inc. v. Wills (In re Wills)*, 243 B.R. 58, 64 (9th Cir. BAP 1999).  The fraudulent intent "must be actual, not constructive".  *Id.*, citing *In re Devers*, 759 F.2d 751, 753 (9th Cir. 1985).

In denial of discharge actions, a "debtor's fraudulent intent may be established by circumstantial evidence or by inferences drawn from his or her  course of conduct." *Id.*, citing *Devers*, 759 F.2d at 753-54); *see Farmers Co-Op Ass'n of Talmage, Kan. v. Strunk*, 671 F.2d 391, 395 (10th Cir.1982).  Cases have held that where a debtor gratuitously conveyed valuable property, the burden shifts to the debtor to prove that his intent was not fraudulent.  *See Matter of Armstrong*, 931 F.2d 1233, 1239 (8th Cir.1991); *In re Schroff*, 156 B.R. 250, 254 (Bankr.W.D.Mo.1993); *cf. In re Mascolo* 505 F.2d 274, 276-77 (1st Cir.1974) (debtor's false

24

statement about concealed assets which was never explained held sufficient to infer fraud).

Section § 727(d)(2) requires that the fraud or knowledge pertain to the failure to report or deliver some property. *See In re Yonikus*, 974 F.2d 901, 904-05 (7th Cir.1992); 1 Daniel R. Cowans, Bankruptcy Law and Practice § 5.72 at 778 (6th ed. 1994) ("The debtor is required to report to the trustee any property which he receives or becomes entitled to or to deliver it to him. Fraudulent failure to do so is a ground of revocation of the discharge of the debtor.") (footnote omitted) (emphasis added); 4 Collier on Bankruptcy ¶ 727.15[4] at 727-113 (15th ed.1996) ( § 727(d)(2) "imposes a duty upon the debtor to report to the trustee any acquisitions of property subsequent to the filing of the petition.") (emphasis added); *cf. Bowman*, 173 B.R. at 925.

The Ninth Circuit wrote, *In re Retz*, 606 F.3d 1189, 1204 (9th Cir. 2010), that a debtor in bankruptcy proceedings has a "duty to share full information with the Trustee." The opportunity to obtain a fresh start is "conditioned upon truthful disclosure." *Id.*, quoting *Aubrey v. Thomas (In re Aubrey)*, 111 B.R. 268, 274 (9th Cir. BAP 1990). The Ninth Circuit affirmed that the debtor's failure to inform the trustee of a transfer is circumstantial evidence of intent to hinder, delay or defraud creditors under 727(a)(2) "because there is no other reasonable explanation" for the delay. *Retz*, 606 F.3d at 1204. The *Retz* panel also noted that certain "badges of fraud" may support a finding of fraudulent intent under § 727(a)(2). 606 F.3d at 1200; *Emmett Valley Assocs. v. Woodfield (In re Woodfield)*, 978 F.2d 516, 518[1] (9th Cir.1992).

---

[1]These factors, not all of which need be present, include (1) a close relationship between the transferor and the transferee; (2) that the transfer was in anticipation of a pending suit; (3) that the transferor Debtor was insolvent or in poor financial condition at the time; (4) that all or substantially all of the Debtor's property was transferred; (5) that the transfer so completely depleted the Debtor's assets that the creditor has been hindered or delayed in recovering any part of the judgment; and (6) that the Debtor received inadequate consideration for the transfer. *Retz*, 606 F.3d at 1200, quoting *Woodfield.*

In considering whether to infer fraudulent intent, this Court notes that the SOUF includes uncontroverted facts numbered 33, 34, 36, 38, 48, 53, 54, 55, 57, 58, 59, 61, 63, 64, and 66, which Franz did not challenge with a statement of genuine issues, and which include evidence from which this Court might infer that he fraudulently failed to report the acquisition of or entitlement to acquire property that would be property of the estate. For his part, Franz is quoted at uncontroverted facts Nos. 45 and 64 of the SOUF admitting to "my mistake" in not giving his inheritance to the Trustee after conversion, that it "was always considered to be more of a borrowing" and that he thought that "things would work out differently than they did ...."[2]

A trial court "is not to make credibility determinations when making or denying summary judgment." *In re Wank*, 505 B.R. 878, 892 n.18 (9th Cir. BAP 2014), quoting *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012). While the SOUF includes a substantial amount of evidence from which this Court might make an inference of fraudulent intent based upon "badges of fraud," *Retz*, 606 F.3d at 1200, in a close call this Court concludes that the specific facts of Franz's denials and explanation, viewed along with the undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in Defendants' favor based on that evidence. *T.W. Elec. Serv.*, 809 F.2d at 631. As the Court noted above, if a rational trier of fact might resolve disputes raised during summary judgment proceedings in favor of the nonmoving party, summary judgment must be denied. *T.W. Elec. Serv.*, 809 F.2d at

---

[2]Other contentions and requests in Franz's response will not be addressed at length. His request to dismiss this adversary proceeding in his response is denied because that relief requires a separate motion under F.R.B.P. Rule 9014(a). His allegation that the Trustee and UST obtained information illegally in violation of his right against self-incrimination is without merit. Franz filed a voluntary petition requesting bankruptcy relief, which includes burdens in addition to its benefits. The burdens include cooperation with the Trustee discussed *infra*.

630; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. at 587. Having concluded that Plaintiff failed to satisfy its burden to show absence of genuine issue of material fact on the "fraudulently" requirement of § 727(d)(2), summary judgment will be denied and the issue may be decided after a trial.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction under 28 U.S.C. § 1334(b) as this adversary proceeding is arising in and related to the above-captioned Chapter 7 bankruptcy case.

2. This adversary proceeding to revoke a debtor's discharge is a core proceeding under 28 U.S.C. § 157(b)(2).

3. The Plaintiff failed its burden for summary judgment to show that there are no genuine issues of material fact with respect to whether the Debtor fraudulently failed to report the acquisition of or entitlement to property of the estate as required to revoke Debtor's discharge under § 727(d)(2).

**IT IS ORDERED** a separate Order shall be entered denying the Plaintiff's motion for summary judgment.

BY THE COURT

*Ralph B Kirscher*

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana