## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

In re

**RANDALL A. FRANZ**,

              Debtor.

Case No.  **10-61754-7**

---

**UNITED STATES TRUSTEE**,

              Plaintiff.

-vs-

**RANDALL A. FRANZ**,

              Defendant.

Adv No.  **15-00003**

## MEMORANDUM OF DECISION

At Butte in said District this 5th day of November, 2015.

In this adversary proceeding the Plaintiff United States Trustee ("UST") requests revocation of the Debtor/Defendant Randall A. Franz's ("Franz" or "Debtor") discharge under 11 U.S.C. § 727(d)(2) for acquiring property that is property of the estate or for becoming entitled to acquire property that would be property of the estate and knowingly and fraudulently failing to report the acquisition of or entitlement to such property or to deliver or surrender such property to the trustee.  Franz, who is pro se, filed an answer denying the UST's allegations.  After a trial held after due notice and this Court having reviewed the parties' briefs and the record, this matter is ready for decision.  For the

1

reasons set forth below, a separate Judgment shall be entered revoking Franz's discharge under § 727(d)(2).

Trial of this adversary proceeding was held at Missoula on September 3, 2015. Franz appeared pro se and testified. Richard J. Samson, Trustee in Franz's above-captioned Chapter 7 bankruptcy case, also testified. Exhibits ("Ex.") 1 – through – 45 were admitted into evidence.[1] At the conclusion of the parties' cases-in-chief the Court granted the parties time to file simultaneous briefs, which have been filed[2] and reviewed by the Court together with the record and applicable law.

## FACTS

Franz is a self-employed real estate broker and property developer who listed his address on his bankruptcy petition as Heron, Montana, where he had a property development project. His mother was Mary Ann Franz ("Mary Ann"). Mary Ann died on May 25, 2009, prior to the commencement of Franz's bankruptcy. (Ex. 44, p. 13). At the time of her death, Mary Ann had funds in various bank accounts and other instruments totaling $48,572.77. (Ex. 45, pp. 23-24, 106-112; Ex. 7). That $48,572.77 comprised the opening balance of a probate estate bank account at the Bank of Whitman in Colfax, Washington, which was deposited on June 11, 2009. (Ex. 45, pp. 23-24; Ex. 21).

---

[1] Objections were raised to the admission of Ex. 12 and 42, but were overruled. All other exhibits were admitted without objection.

[2] Franz filed a brief in opposition to summary judgment on September 18, 2015, which was decided earlier in this case. On September 29, 2015, Franz filed his post-trial brief.

Mary Ann owned three real properties upon her death, referred to by Franz as (1) a vacant lot on a hillside near Park Street in Colfax, Washington; (2) the Franz Apartments, located next to the Congregational Church in Colfax; and (3) the Marcus Place Apartments on Lake Street in Colfax. (Ex. 45, p. 23; Ex. 6). The summary of Mary Ann's probate estate states that her assets were worth at least $525,444.51. Ex. 43. In her will Mary Ann left all of her assets in equal shares to her three sons (Franz and his two brothers, Brian and Lee Roy). (Ex. 45, pp. 14-15, 21; Ex. 1). Samson testified that each one-third share came out to approximately $175,000.

Franz's brother Lee Roy Franz ("Lee Roy") has mental health disabilities (Ex. 45, pp. 17, 226, 231). Franz testified that Lee Roy is mentally incapacitated and lives in a state hospital in Washington. On or about June 22, 2009, a guardian ad litem was appointed for Lee Roy by the Superior Court of the State of Washington, in and for the County of Whitman. (Ex. 45, pp. 16-18; Ex. 3)

Franz commenced his bankruptcy case under chapter 11 on July 20, 2010, in order to stop foreclosure proceedings against 80 acres of real property he was trying to develop. He was represented in his chapter 11 case by attorney Jon R. Binney ("Binney") until Binney withdrew. By stipulation with the UST, his case was converted to chapter 7 on January 17, 2013 (Case No. 10-61754-7, Document Nos. 169/170). Franz filed his original Schedules and Statement of Financial Affairs ("SOFA") on August 3, 2010 (Doc. 7), which he signed under penalty of perjury.

3

In his original Schedule B, in response to item 20 Franz disclosed he was entitled to a "1/3 beneficiary interest in estate of Mary Ann Franz" and valued his interest at $100,000. (Ex. 45, p. 104). Franz acknowledged that he took money from his mother's estate before and after his bankruptcy: "But it did continue. I mean, I was broke. I was homeless. I had no money to do anything. Everything I owned was tied up in the bankruptcy." (Ex. 45, pp. 119, 122). Franz took at least $10,659.89 from his mother's probate estate for his own use and benefit between the date of her death on May 25, 2009, and the date he commenced his bankruptcy case on July 20, 2010, which were not disclosed in Defendant's SOFA. (Doc. 7).

On August 30, 2010, the chapter 11 meeting of creditors was commenced pursuant to 11 U.S.C. § 341; Franz appeared with counsel and testified under oath. (Ex. 45, p. 123; and Doc. 5).

On October 22, 2010, Franz was appointed as personal representative ("PR") of his mother's probate estate by the Superior Court of the State of Washington, in and for the County of Whitman. (Ex. 45, p. 20; Ex. 4). On or about November 12, 2010, acting as the PR for his mother's estate, Franz sold a vacant lot in Colfax for $4,000, and realized net cash from the sale in the amount of $3,990.98, which he deposited into the Mary Ann's probate estate account. (Ex. 45, pp. 25-26; Ex. 8). On or about March 3, 2011, acting as the PR for his mother's estate, Franz sold the Franz Apartments for $35,000, and realized net cash from the sale in the amount of $31,367.82, which was deposited into the

4

probate estate account. (Ex. 45, pp. 27-28; Ex. 9).

Franz admitted that the judge assigned to his mother's probate estate had no knowledge that Franz was taking and using most of the assets for his own benefit:

> Q [by Neal Jensen of UST] Is the probate judge aware that you have sold all of your mother's assets and that you have spent most of them?
>
> A I have not spoken to the probate judge, no.
>
> Q By that, I want to know if anything has been filed with the judge that would alert him to the fact that the estate has been liquidated and substantial monies have been taken by you personally?
>
> A No, nothing has been filed.

(Ex. 45, p. 128).

Franz admitted he did not inform the probate court or the attorney who was handling his mother's probate estate for which he was PR that he had taken $48,862.55 from the Marcus Place Apartments account for his own use and benefit. (Ex. 45, pp. 168-169).

Franz's case was in chapter 11 from July 20, 2010, through January 17, 2013, when he converted his case to chapter 7.  (Docs. 1 and 170).  While in Chapter 11, Franz filed Monthly Operating Reports ("MOR") in which he was required to disclose, under penalty of perjury, that the information contained therein was complete, true and correct to the best of his knowledge, information and belief.   His MORs during the Chapter 11

case[3] show a total of $15,300.00 in distributions received from his mother's estate. Ex. 41 lists a total of $42,126.50 of expenditures of funds from Mary Ann's probate estate which Franz spent on himself and his family members, or for their benefit, including $31,466.61 spent postpetition. Franz testified that some of the expenditures on Ex. 41 were expenses and most were "offsets." Samson testified that, even if those amounts were offset against his inheritance, Franz still was entitled to approximately $130,000 from his mother's estate.

Franz testified that he spent monies of Mary Ann's estate on hand at the time of Mary Ann's death and proceeds from the sale of a vacant lot shown on Ex. 43, while his case was in chapter 11, and that he spent approximately $85,000 of Mary Ann's estate funds by "draws" helping his brother and trying to finish his subdivision.[4]

Franz acknowledged that he knew, after his case converted to chapter 7, that his one-third share of his mother's inheritance was property of his bankruptcy estate:

> Q [Jensen] You acknowledge, do you not, that your one-third interest in your mother's estate was property of your bankruptcy estate from the day you filed bankruptcy in July of 2010?
>
> A I guess that's my misunderstanding. I didn't understand that that was – until we got into the liquidation of the Chapter 7 bankruptcy, then that was conveyed to me.[]

---

[3] The MORs are found on the docket at Doc. Nos. 100, 104, 110, and 115, of which the Court takes judicial notice.

[4] He testified that the subdivision "all fell apart."

6

(Ex. 45 p. 122).

Following conversion of his case to chapter 7 on January 17, 2013, Samson was appointed as the trustee for in the chapter 7 bankruptcy case.  Franz knew that after his case was converted to chapter 7 he was required to turn over any monies he received to his bankruptcy trustee:

> Q [Jensen] So is it your thinking that you can just take as much money out of the estate and get it down to zero in order to avoid turning anything over to your bankruptcy trustee?
>
> A That is – no, that is not my understanding.
>
> Q I am trying to understand what you are saying to me. You say that you were informed that any monies that you received after the case converted to Chapter 7 would have to be turned over to your bankruptcy trustee. Correct?
>
> A I was told that in 2013, yes.
>
> Q When your case converted, in January of 2013?
>
> A Yes.

(Ex. 45, pp. 120-121).

On March 2, 2013, after conversion to chapter 7, Franz filed amended Schedules. (Doc. 176).  At item 20 of amended Schedule B Franz changed the current value of his 1/3 interest in his mother's estate to "Unknown."  Franz testified that the only assets left in Mary Ann's probate estate when his case was converted were the Marcus Place Apartments, of which his one-third share came out to approximately $130,000.

Franz did not list Janice Stamness (his mother-in-law) or Perry Stamness (his

7

brother-in-law) as creditors in either his original bankruptcy Schedules or in his Amended

Schedules filed after conversion to Chapter 7, even though they had loaned Franz $13,700

and $1,500 in 2010 before he filed his bankruptcy case (Ex. 45, pp. 41-43, 189-195).

Franz admitted that money in a bank account under the name of Selkirk Development

LLC was his money.  Franz used these funds to pay his prepetition debts to Janice

Stamness and Perry Stamness in the amount of $15,200.  (Ex. 45, pp. 41-44, 68-69,

189-195).  Franz did not disclose to the Trustee Samson that he took money out of the

Selkirk Development LLC bank account in July of 2013 to repay these creditors (Ex. 45,

pp. 196-197).  Franz admitted Selkirk Development LLC may have been defunct when

his case converted to chapter 7, but in any event he was the sole member of the LLC, and

he admitted he did not inform Samson that he had money in the LLC's bank account and

that he was using the account:

> Q [Jensen] No, at this point in time, you are in a Chapter 7 case and all of
> your assets belong to Mr. – the trustee Dick Samson is in charge of all of
> the assets of the bankruptcy estate, including anything that is in the name of
> Selkirk Development, LLC.
>
> A Okay.
>
> Q Did you make Mr. Samson aware that there was $1,000 sitting in this
> bank account?
>
> A No.

(Ex. 45, pp. 179-180).

When Franz filed his original Schedules he did not list his wife's cousin

8

Mike Northquest ("Northquest") as a creditor owed monies for prepetition loans made to allow Franz to finish his subdivision project.  (Ex. 45, pp. 61, 66).  Later Franz admitted that Northquest was not a creditor of his mother's estate, but rather was Franz's creditor.  (Ex. 45, p. 252).  Franz did not list Northquest as a creditor when he filed his Amended Schedules.

Franz did not list his ex-wife as a creditor in his Schedules arising from their divorce, nor did he list any community property interest arising from the divorce which took place in Idaho.

Franz did not disclose his ownership of a 2001 Nissan Pathfinder in either his original bankruptcy schedules or his amended Schedules, and he did not deliver or surrender that vehicle to the Trustee. (Ex. 45, pp. 92, 96).

Although Franz has taken and spent large portions of the one-third inheritance shares of his brothers, Brian and Lee Roy, those individuals were not listed as creditors in his bankruptcy Schedules.  During his Rule 2004 examination Franz admitted that he owes his brothers for the monies he took and spent from their shares of their inheritance. (Ex. 45, pp. 240-241).

A second § 341 meeting was conducted under chapter 7 on March 4, 2013, where Franz again appeared with counsel and testified under oath. (Ex. 45, p. 161;  Doc. 172). During the § 341 meeting the Trustee Samson instructed Franz:  "Well, coming back to the estate, I just want to make it clear that any money that you have now, that you are

9

entitled to receive, probably needs to come to me."  Ex. 45, p. 230.  Franz replied:

"Okay."  Samson emphasized:  "What I need you to do is, I need you to keep me posted

as to the status of the estate."  Franz replied "Okay" and "Yeah."  Ex. 45, p. 230.  Then

Samson noted that because Franz was the PR of his mother's estate, and "the guy that's in

control[,]" "So I want to make it clear that you need to keep me posted as far as any

developments."  Franz replied "Yeah." (Ex. 45, p. 230).

At the § 341 meeting Franz did not disclose that he had a buy-sell agreement

signed in June 2012 for the sale of the Marcus Place Apartments and that he was about to

close on that sale three months later on June 27, 2013, despite being specifically asked

about such matters by the Trustee.[5]  (Ex. 45, pp. 11-12, 30-31, 162, 226-227, 230 and

233).  Samson also asked Franz to keep him "informed and advised as to the status of the

Marcus Place apartments," and also asked him to keep him "advised of any potential sales

and to keep me [Samson] advised of any progress in that regard." (Ex. 45, p. 12).  Samson

asked Franz:  "Okay. So you are going to keep me posted for sure on that probate estate.

Right?"  Franz replied: "Yeah. Yeah. If that sale moves forward, I will." (Ex. 45, p. 233).

Later Samson again told Franz:  "And just keep me posted on that estate and what the

progress -- [,]" to which Franz replied:  "Yeah." (Ex. 45, p. 233).

During Franz's later Rule 2004 examination the following Q and A occurred:

> Q [Jensen] So I count a number of times in that [§ 341] transcript
> where you were told by your trustee to keep him in the loop, to keep

---

[5] Franz testified that he notified his attorney Binney about the sale on June 28.

> him informed of the status of the sale of that property. Did you do
> that?
>
> A No.

Ex. 45, p. 233.

Franz admitted that he did not tell Samson at the § 341 meeting that he had a

buy-sell agreement on the Marcus Place Apartments and that he was about ready to close

on such sale at that time. (Ex. 45,  pp. 226-227).  He admitted that he never informed

Samson of the pending or final sale of the Marcus Place Apartments:

> Q [Jensen] So did you ever inform Samson, your Chapter 7 trustee, that this sale
> was pending? That you had the property – you had signed a buy-sell agreement in
> June of 2012 and you were getting ready to close it?
>
> A No.

Ex. 45, p. 162.

Franz was asked if he ever told Samson the Marcus Place Apartments had been

sold; he answered that he had not:

> Q [Jensen – reading from Samson's October 24, 2013, email to
> Franz –  Ex. 34] "My questions are very straightforward. One, what
> is the current value of the real property in your mother's estate? Two,
> what amount, if any, is owned against the real property? Three, is the
> property currently generating any income; and, if so, how much per
> month, gross and net? Four, if the property has produced income,
> what has happened to the net proceeds? Five, I was told by Mr.
> Libey [the probate attorney in Washington] that the property is no
> longer listed for sale. If that is accurate, why is it not listed for sale?
> Six, at your creditor meeting, you mentioned that there was a
> potential sale in the works. What happened to that buyer?" [Jensen]
> Did you ever write him back or call him or notify him and tell him,
> "Mr. Samson, the property has been sold"?

A No, I guess not. No.

(Ex. 45, p. 244).

On May 6, 2013, after expiration of the deadlines to object, Franz received a discharge. (Doc. 181).

In a number of subsequent emails, Samson repeatedly instructed Franz to keep him informed of the status of the Mary Ann Franz probate and the sale of the Marcus Place Apartments (Ex. 45, pp. 11-12, 30-31, 162, 226-227, 230 and 233;  Ex. 33-through-37). Notwithstanding those instructions, Franz sold the Marcus Place Apartments (Ex. 10), took the reserve account (Ex. 45, pp. 32-33, 136-137, 163-167;  Ex. 22 and 23) and used the proceeds for his own use and benefit without ever disclosing anything about the sale to the Trustee or the proceeds and their disposition. (Ex. 45, pp. 162-167).

Samson testified that he did not find out about that sale for a year and a half after the sale closed.  Franz testified that Samson got an email from Binney about the sale dated July 1, 2013, and that he thought Samson knew about the sale as a result.

On or about June 27, 2013,[6] Franz sold the Marcus Place Apartments for $640,000 and realized net cash from the sale after the payment of all liens and encumbrances and other costs of sale in the amount of $382,650.39, which was deposited into the probate estate account. (Ex. 45, pp. 29-32 and 157; Ex. 10)  This was in addition to the $10,000 earnest money which Franz received in connection with the sale of the Marcus Place

---

[6] At trial Franz testified the sale closed in July 2013.

12

Apartments, which brought the total net cash realized to $392,650.39. (Ex. 45, pp. 157 and 269; Ex. 10).

Franz agreed that he and his brothers each were entitled to one-third of the $382,650.39 net proceeds from the sale of the Marcus Place Apartments that occurred after his case was converted to chapter 7, which came to $127,550.13[7] (Ex. 45, pp. 36, 45; Ex. 10). Franz admitted that he took more than his own one-third share of his mother's estate and he acknowledged he would have to repay his brothers and his bankruptcy estate somehow:

> Q [Jensen] If you steal money from someone while you are in bankruptcy, is it your understanding that you get to keep that money?
>
> A It was always considered to be more of a borrowing than –
>
> Q As a personal representative, again, as a fiduciary, do you understand that you can't just unilaterally borrow money any time you think you need some extra cash?
>
> A That's not – that wasn't what the intent was, so – but if you put it that way, I guess that's – I don't know what I am supposed to say to that.
>
> Q What was your intent? You have no ability to repay this money that you have taken, that didn't belong to you, that you have given away, that you have loaned, that you have taken and you have spent and you have gifted. Where is this money going to come from to reimburse this probate estate that you are acting as a personal representative for? Huh? Where is

---

[7] This does not include the $10,000 earnest money deposit, which increased the actual net proceeds from $382,650.39 to $392,650.39, and which, when divided by three, comes to $130,883.46 for each brother. Ex. 45, pp. 157, 269; Ex. 10.

this money going to come from?

A I am just going to have to repay it.

Q How? You are broke. Right? Destitute. Right? Still taking money from this piggy bank. Correct?

A I guess, yeah.

(Ex. 45, pp. 183-184).

When the Marcus Place Apartments sold, Franz took the $48,862.55 that was in the reserve account established for the apartment building and kept it for his own personal use and benefit, in return for his managing the project and putting together the sale. (Ex. 45, pp. 32-33,  136-137, 163-167; Ex. 22 and 23).  Franz did not disclose the sale of the Marcus Place Apartments or his receipt and expenditure of the sale proceeds or the reserve account funds to the Trustee; he did not deliver or surrender any of it to the Trustee. (Ex. 45, p. 162).  Franz admitted that he told no one except his brother Brian about the fact he took and spent for his own personal use and benefit the $48,862.55 that was in the reserve account for the Marcus Place Apartments:

Q [Jensen] Did you get anyone's approval before you just took this $50,000?

A I discussed it with my brother Brian, yes.

Q You talked to your brother Brian; and your brother Brian said, "Go ahead and take the $48,862"?

A Um-hum.

Q Yes?

14

A Yes.

Q Did you talk to your other brother, Lee?

A I wasn't able to talk to him.

Q Did you talk to his care-givers, those people that were providing him care, taking care of him?

A No.

Q Did you talk to the probate judge?

A No.

Q Pardon?

A No.

Q Did you talk – at this point in time, the estate was represented by counsel. Did you talk to counsel for the probate estate?

A No.

Q Was counsel for the probate estate even aware that you took this $48,000 that was left over in the reserve account?

A No.

(Ex. 45, pp. 166-169).

Franz testified at his Rule 2004 examination that he took these funds as a real estate commission for assisting in the sale of the Marcus Place Apartments, but he had no authority to do so, did not have a listing agreement, did not make the real estate agency for which he worked in Idaho aware of this sale or his commission, and he was not licensed as a realtor in the State of Washington at the time of the sale.  (Ex. 45, pp. 32-33

15

and 170-174).

Of the funds realized from the assets in his mother's estate, $7,500 was distributed by Franz to his brother Brian in 2010 and 2011 (Ex. 45, pp. 140-141, 148, 153-154, and 264), which was later followed up by a $90,000 wire transfer by Franz from Mary Ann's estate account to Brian on July 5, 2013 (Ex. 45, pp. 45-46,  59, 125 and 265; Ex. 15). Additional funds were used by Franz to pay Brian's $1,040 credit card bill with Sears Roebuck and other payments for a total paid to Brian of $110,000. (Ex. 45, pp. 54-55, 125).

Franz admitted he did not inform Lee Roy's guardian ad litem aware of the fact that he was spending Lee Roy's share of their mother's inheritance and has not spoken to Lee Roy's guardian ad litem since the Fall of 2009. (Ex. 45, pp. 223-225).

> Q [Jensen] So you never asked her – informed her about what you are doing with her ward's money, with your brother's one-third of the inheritance?
>
> A No.
>
> Q You have never contacted her to say, "I am spending this money. Maybe you should be aware of it"?
>
> A No.
>
> Q "I am taking this money that belongs to my brother and I am investing it. I am loaning it to friends of mine. I am buying trust indentures"? You never asked her whether that was acceptable to her ward, have you?
>
> A No.

16

After conversion of his case to Chapter 7, Franz began to take large amounts of funds from his mother's estate account for his own use and benefit, or to place into Selkirk Development LLC or for gifts to his wife[8] and children, on the rationale that such funds constituted his one-third inheritance from his mother's estate. (Ex. 45, pp. 38, 43-44, 50-60, 70-98, and 197-198). Asked at the Rule 2004 examination: "But you knowingly took money that didn't belong to you, your one-third inheritance, and spent it, instead of giving it to your bankruptcy trustee after your conversion to Chapter 7? Fair statement?" Franz answered: "Yes. It was my mistake, yes." Ex. 45, p. 198.

Franz admitted that $30,000 which he wire transferred from his mother's estate account to the Selkirk Development LLC account on July 11, 2013, was a part of his one-third inheritance, and that he did not disclose these funds to Samson or turn them over to Samson:

> Q [Jensen] Here is my question, which you have ignored. Do you admit that the $30,000 that you transferred from your mother's probate account into the Selkirk Development account on July 11, 2013, was supposed to be, in your mind, part of your inheritance, your one-third inheritance?
>
> A Yes.
>
> Q Thank you. And why, again, did you not inform your trustee – you were in bankruptcy now, in Chapter 7 bankruptcy, by the time you make this transfer into the Selkirk Development, LLC, account. Why do you not tell
> your bankruptcy trustee about this inheritance, this one-third

---

[8] He testified that his wife filed for divorced, and the divorce was finalized in September of 2013.

17

inheritance, that you still had some money owning to you at the time? In other words, you admit that your inheritance, your one-third, which you have listed twice now in your bankruptcy schedules, is an asset of this bankruptcy estate. Why then did you not take the $30,000 and give it to Mr. Samson, as opposed to putting it into Selkirk Development's account where you promptly diminished it?

A I don't know how to answer that, other than I thought, you know, things would work out differently than they did; but it didn't work out that way.

Q Exhibit 25 goes from 30,000 plus $1,000 that you deposited when it was overdraft, say $31,000, it goes down to an ending balance November of '14 of $187.64. Do you admit that all of the money that went into this account, 30,000 and the 1,000 that came from your mother's estate, you spent it on yourself or your family members for personal affairs?

A Yes. I squared up and paid the loans back that I had, and then the rest of it was spent on –

Q Paid your bills?

A Yes.

Q Yes. Correct?

A There was some of the bankruptcy stuff for the moving and other things that the money went for; but, yes, it was – it was trying to implement the plan and get moved out of Montana.

Q The plan was long since over by this point in time. You are in Chapter 7.

A Yes. Yes. Having to move with no money, it – trying not to get shot by the neighbor, and I'm ducking bullets. I mean, I am still scared to go to Heron, Montana, for fear that I am going to get shot.

Q But you knowingly took money that didn't belong to you, your one-third inheritance, and spent it, instead of giving it to your

18

bankruptcy trustee after your conversion to Chapter 7? Fair
statement?

A Yes. It was my mistake, yes.

Ex. 45, pp. 196-197.

On or about July 11, 2013, Franz wire transferred $30,000 from his mother's estate

account into the account of Selkirk Development LLC, which he claimed was part of his

one-third share of his inheritance.  (Ex. 45, pp. 38, 41-42, 180-182, 194-199; Ex. 13, 25,

26, 28).  Franz used those funds to repay debts owed to relatives and others, without

disclosing the existence of these funds, the wire transfer, or his personal use of such funds

to the Trustee; and he did not deliver or surrender any portion of these funds to the

Trustee.  (Ex. 45, pp. 196-199).  Samson testified that none of those transactions were

authorized by the Washington court in his mother's probate case.

Defendant took money his mother's estate account for his personal use and benefit,

including a check mailed to Northquest, his wife's cousin, for the sum of $60,000 in July

of 2013 (after the conversion of his bankruptcy case to Chapter 7) to repay Northquest for

funds borrowed by Franz in the Summer of 2009 and the Spring of 2010 prior to the

commencement of his bankruptcy case.  (Ex. 45, pp. 60-64; Ex. 15, check no. 519, dated

7/2/13).  Franz admitted that he did not make Samson aware of the $60,000 he spent of

his inheritance by paying his debt to Northquest, although he admitted this $60,000 was a

part of his one-third share of his inheritance, he did not disclose his payment of such

funds to Northquest to the (Ex. 45, pp. 61-64, 66, 236 and 250).  Franz admitted the

19

$60,000 lent to him by Northquest occurred before his bankruptcy was filed (Ex. 45, pp. 202-207) and Franz repaid him the money on July 2, 2013, after his case was converted to chapter 7. (Ex. 45, pp. 207, 259).

At the Rule 2004 examination the following exchange happened:

> Q [Jensen] Well, there was $60,000 left after you converted to Chapter 7 that you took and sent to pay one of your bills.
>
> A I had already borrowed that money and agreed to repay it back from the sales.
>
> Q Yes, but you borrowed it. You borrowed it. It was your money owing. You took money that didn't belong to you. You took your inheritance -- after your bankruptcy was converted to a 7, you took that money and you sent it off to pay a creditor of yours without telling Mr. Samson.
>
> A The commitment was made prior to the filing in the bankruptcy.
>
> Q All your bills were committed – all your creditors were commitments prior to the bankruptcy. They didn't get paid any money. You singled out one creditor and sent him $60,000. The rest of these creditors didn't get paid any money.
>
> A That was the arrangement I made with Mr. Northquest. Mr. Northquest provided the engineering funding needed to try to get the subdivision done. And because I couldn't pay the quarterly trustee's fees, it got kicked into a 7; and I lost a half-a-million dollar property that Mr. Doyle is now using my engineering to subdivide the property and laughing all the way to the bank.

Ex. 45, pp. 259-260.

On August 30, 2013, as PR for his mother's probate estate, Franz loaned $60,000

20

to All Seasons, LLC, a real estate firm where Franz works which is owned by Paula

Kamp, which All Seasons was to repay by interest-only payments in the amount of $500

per month and with a balloon payment on its maturity date.  (Ex. 45, pp. 75-76 and

128-132; Ex. 15, check no. 521).  Originally it was to be a one year loan, but when All

Seasons was unable to repay the loan on September 1, 2014, it was "rolled over" for a

second year by Franz.  (Ex. 45, pp. 76-77 and 129).  Franz testified that the proceeds from

repayment of this loan is intended to be place in a trust for Lee Roy.  Franz, as PR for his

mother's probate estate, although personally having taken and spent more than his own

one-third share of his inheritance, has never paid anything to his disabled brother, Lee

Roy Franz, for Lee Roy's one-third share of his inheritance. (Ex. 45, pp. 73-74, 125-127,

131-132, 209-212, 223-226 and 264-265)

　　　Ex. 15 is a check register for the bank account of the estate of Franz's mother at

American West Bank.  Ex. 16 are bank statements of the same American West Bank

account.  Ex. 15 and 16 list a series of transfers from the account of Mary Ann's estate at

American West Bank in the total amount of approximately $376,895.86.  Ex. 42 shows

the transfers to Franz's wife, children, brother Brian and other relatives, and for Franz's

personal use.  All of those transactions took place after the conversion of Franz's

bankruptcy to Chapter 7, and after the second § 341 meeting, without the knowledge of

the Trustee.  The total amount of funds which Franz took from his mother's probate estate

account at American West Bank for his own personal use and benefit, or for gifts to

family is approximately $280,855.86, which left only $31,035.43 in the account as of November of 2014. (Ex. 45, p. 97).

Franz also took funds for his own personal use or for his children from his mother's estate's account at the Bank of Whitman. (Ex. 45, pp. 118-119).  During his Rule 2004 examination Franz stated that such monies totaled approximately $56,000 (Ex. 45, pp. 40-41, 115, and 151; Ex. 20).  Other evidence suggests that the amount of withdrawals from said accounts which can be attributed to Franz's use and benefit or gifts to his family members totals just over $42,000, after Franz paid up to $30,000 for his mother's funeral expense and bills.  Ex. 45, pp. 40, 113-14, 133; Ex. 20 and 21)

 Franz's brother Brian received $7,500 from the Bank of Whitman estate account in the following checks written by Franz, which allegedly represented a portion of Brian's one-third share of his mother's inheritance. (Ex. 45, pp. 153-154; Ex. 20 and 21).  These funds, in addition to $90,000 Defendant wired to Brian Franz on July 2, 2013 (Ex. 45, pp. 44-46, 59, 265; Ex. 14 and 16), and the $1,040 Defendant paid on Brian Franz' Sears card on May 12, 2013 (Ex. 45, pp. 54, 266; Ex. 15), reveal that Brian Franz received $98,540 (Ex. 45, p. 266) of his one-third share of his inheritance from his mother.

Franz purchased a 2001 GMC pickup on or about January 17, 2014, for $10,000 with funds taken from the Mary Ann Franz estate, and he did not deliver or surrender such vehicle to his Chapter 7 bankruptcy trustee. (Ex. 45, pp. 57, 82-83)

On November 2, 2014, the Trustee moved for a Rule 2004 examination of Franz,

22

which was granted and the examination was conducted on December 15, 2014.  Franz was represented at the Rule 2004 examination by attorney Quentin Rhoades.  At Franz's request Samson delayed the Rule 2004 examination.  Meanwhile, Ex. 33, 34, 35, 36 and 37 are email exchanges between the Trustee and Franz in which the Trustee explains to Franz his need for information about his mother's probate estate, and in which Franz explains why he cannot comply because of the status of Mary Ann's probate estate, his problems with is former attorney Binney and his real estate development at Heron, and his divorce.  Samson testified that Franz gave him Ex. 1 - through -32 at the Rule 2004 examination.

At the 2004 exam Samson asked Franz why, during the chapter 7 § 341 meeting held in March 2013, Franz did not communicate with Samson that the Marcus Place Apartments were in the process of being sold, to which Franz replied:  "I don't have an answer for that. I don't know."  Ex. 45,  p. 31.  When Samson asked:  "Is there a reason why, a year ago, when I was communicating with you by E-mail, that you didn't tell me, yes, the property has sold?"  Franz replied:  "The – it was my understanding that the – my share was what you were interested in; and so, no, we – there is no reason that that wasn't communicated to you.  Probably should have been, in hindsight."  Ex. 45, p. 31.

Franz admitted taking a final $6,000 from his mother's estate account for his own use between the initial date set for of his Rule 2004 examination and the date his examination was actually conducted, for his own use:

Q [Jensen] So you just cleaned out the account, essentially?
Took the last $6,000. And I assume you have spent it?

A Yes.

Q What did you spend it on?

A Paid my bills.

Ex. 45, pp. 185-86.

Franz did not dispute that he used his mother's estate account as his

own private piggy bank:

Q [Jensen] Sir, from where I sit, it looks like you used this
estate account as your own private piggy bank, that whenever
you needed money, you just took it. When you wanted to loan
money to a friend, you just lent it. Do you dispute that?

A No.

Ex. 45, p. 186.

Franz admitted as late as September of 2014, that he had not told Samson what

was happening with regard to his mother's estate:

Q [Jensen – reading from Samson's email to Franz on Sept. 23, 2014 – Tr.
Ex. 37] "Mr. Franz, before I put this matter in front of the court and require
your attendance at a deposition, I would ask that you communicate with me
prior to the end of this week. My address, phone number, and E-mail
address are below. Thank you." [Jensen] He is again searching for
information with regard to your mother's probate estate, which you have
failed to give him; and now this is September, just a couple of months ago.
He is still asking, "Tell me what is going on with regard to your mother's
estate."

A I understand

Q And you are not telling him anything. Right?

A Yes.

* * * *

Q Why don't you cooperate with his requests by telling him that the property has been sold and you took the money and you spent it? This is two months ago. It is now – it is three months ago. It is September of 2014. And you are still telling him nothing in response to his requests about what is going on with the probate. You are still telling him nothing.

A Yes.

Ex. 45, pp. 257-58.

On or about December 15, 2014, Defendant transferred $25,000 of the remaining balance in his mother's probate estate account to his attorney, to be held in trust until a judicial determination[9] could be made as to the proper owner of such funds.  But prior to doing so, and after making a $5,000 retainer payment to his attorney, Defendant took an additional $6,000 from the funds remaining in his mother's estate account for his own personal use and benefit.  Ex. 45, pp. 97-98.

When asked on direct examination whether Franz had paid the estate anything Samson answered: "Not a dime.[10]"  At trial Franz testified that he paid his ex-wife and

_____

[9] Samson testified that Lee Roy's guardian ad litem has filed a request for an accounting and to replace Franz as PR of Mary Ann's estate in the Washington probate case.  He also testified that Franz told him that he would resign as PR, but as of the date of trial he had not.

[10] Samson testified that he has initiated adversary proceedings to recover some of the transfers by Franz to former family members.  Samson filed a motion to substitute Franz as PR in the probate case, so that Franz cannot sue the transferees and Samson can negotiate settlements.

25

others approximately $84,000 and that from his standpoint no money remained to give to the Trustee after settlement of his divorce and payment of "offsets." Soon after that Franz reversed himself, and testified that he is not saying he does not owe Samson any money and that he had told his former attorney Binney to offer to settle with Samson for $30,000. Samson testified that, if Franz had turned over his 1/3 inheritance from Mary Ann's estate, even after offsets, this would have had a solvent estate with enough money to pay all administrative expenses and pay all Franz's creditors in full with interest, with a "substantial" surplus left over to pay back to Franz.

## DISCUSSION

The UST's complaint seeks revocation of Franz's discharge under § 727(d)(2). Section 727(d)(2) provides in pertinent part that a court "shall revoke a discharge granted under subsection (a) of this section if – . . . (2) the debtor acquired property that is property of the estate, or became entitled to acquire property that would be property of the estate, and knowingly and fraudulently failed to report the acquisition of or entitlement to such property, or to deliver or surrender such property to the trustee . . . ." Under § 727(d)(2), the UST must prove both (1) that Debtor acquired property of the bankruptcy estate and (2) that he knowingly and fraudulently failed to report or deliver such property to Trustee. *In re Romaine*, 2012 WL 768173, *3 (Bankr. D. Idaho 2012); *Krommenhoek v. Covino (In re Covino)*, 241 B.R. 673, 677 (Bankr. D. Idaho 1999) (citing *Bowman v. Belt Valley Bank (In re Bowman)*, 173 B.R. 922, 925–26 (9th Cir. BAP 1994)).

26

The UST, as the plaintiff in this adversary proceeding, bears the burden of proof and must establish all elements by a preponderance of the evidence. *Romaine*, 2012 WL 768173 at *3; *Covino*, 241 B.R. at 677. Section 727(d)(2) must be construed liberally in favor of the Debtor, and strictly against the party objecting to discharge. *Covino*, at 678, citing *First Beverly Bank v. Adeeb (In re Adeeb)*, 787 F.2d 1339,1342 (9th Cir.1986).

In *Bowman* the BAP reversed this Court's revocation of a debtor's discharge under § 727(d)(2) because there was no evidence, nor even any allegation in the complaint, that the debtor failed to report any acquisition of property to the trustee. 173 B.R. at 926. The BAP wrote: "Both elements must be met and the plaintiff must prove that the debtor acted with knowing intent to defraud." *Bowman*, 173 B.R. at 925, citing *In re Yonikus*, 9047 F.2d 901, 905 (7th Cir. 1992). The UST's complaint does not suffer from the same lack of allegations in the complaint as in *Bowman*. Paragraphs 34, 36, 37, 38, 42, and 43 of the complaint specifically allege that Franz failed to report acquisitions of property of the estate to the Trustee.

In addition, the above-quoted excerpts from Franz's Rule 2004 examination, Ex. 45, provide extensive evidence and detail proving by a great preponderance of the evidence that Franz knowingly failed, despite being told by his attorney and numerous times by the Trustee Samson, to keep Samson informed about the sale of the Marcus Place Apartments, of which one-third of the net proceeds were property of the estate, and that Franz knowingly failed to report the acquisition of or entitlement to such property, or

to deliver such property to the Trustee.

The case was converted to a case under chapter 7 on January 17, 2013.  The evidence shows that the sale of the Marcus Place Apartments closed in June or July of 2013.  No serious dispute exists that Franz acquired that property of the bankruptcy estate or that he knowingly failed to report or deliver such property to the Trustee.  Those elements of § 727(d)(2) are proven by a preponderance of the evidence.

Franz testified that his one-third share of the proceeds from the sale of the Marcus Place Apartments was $130,000, which was property of the estate.  The Trustee testified that Franz has not paid Samson "a dime."  Franz does not dispute that he spent the proceeds from sale of the Marcus Place Apartments.  He testified and the facts above recite several exhibits detailing how he spent the proceeds on himself, his brother, his children, and to his wife in their divorce.  Franz's defense to the allegations in his post-trial brief argues that pressures from his former attorney Binney and his ex-wife in their divorce, and his need for a real estate commission, left him no choice and excuses his failure to turn over the sale proceeds to the Trustee, and that the Trustee "is a creditor and should be barred from harassing a discharged debtor."

Courts have a duty to construe pro se pleadings liberally, including pro se motions as well as complaints.  *Bernhardt v. L.A. Cty.*, 339 F.3d 920, 925 (9th Cir. 2003); *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988).  Even construing Franz's brief liberally the Court finds that his argument lacks merit.  The Trustee has

specific statutory duties under 11 U.S.C. § 704(a) to collect and reduce to money the property of the estate for which the trustee serves.  The Debtor has a specific statutory duty under 11 U.S.C. § 521(a)(4) to "surrender to the trustee all property of the estate" and any information relating to property of the estate.  By taking the $130,000 one-third inheritance share of the sale of the Marcus Place Apartments and spending it on himself and family members, Franz failed to perform his duty under § 521(a)(4) and hindered the Trustee in his performance of his duty.

Debtor's argument that the Idaho divorce case compelled him to spend his inheritance likewise lacks merit.  Under 11 U.S.C. § 541(a)(2), the interests of the debtor and the debtor's spouse in community property as of the commencement of the case that is under the debtor's control, are property of the estate.  The Supremacy Clause of the United States Constitution invalidates state statutes to the extent they are inconsistent with, or contrary to, the purposes or objectives of federal law.  U.S. Const., art. VI, cl. 2; *In re Applebaum*, 422 B.R. 684, 688 (9th Cir. BAP 2009), citing *Perez v. Campbell*, 402 U.S. 637, 652 (1971).  Whatever the status of Franz's divorce case in Idaho, the Supremacy Clause requires that the Bankruptcy Code's requirements prevail over any state statute inconsistent with them.

One such Code requirement is the automatic stay of 11 U.S.C. § 362(a) against the continuation of a judicial action or proceeding against the debtor.  Relief from the stay was neither sought nor granted in the instant case in order to proceed with a divorce case

in Idaho.  Actions taken in violation of the stay are void, not voidable.  *In re Tippett*, 542

F.3d 684, 691 (9th Cir. 2008); *Schwartz v. United States (In re Schwartz)*, 954 F.2d 569,

571 (9th Cir.1992); *see also Gruntz v. Cty. of L.A. (In re Gruntz)*, 202 F.3d 1074, 1082

(9th Cir.2000) (en banc).  Franz did not inform the Trustee that he intended to, and had no

authority to, spend his one-third inheritance from his mother's estate after he acquired it.

Turning to the "fraudulently" part of "knowingly and fraudulently," the same

phrase is found under 727(a)(4), under which a discharge may be denied if a plaintiff

shows that the debtor "knowingly and fraudulently" made a false oath.  *Fogal Legware of*

*Switz., Inc. v. Wills (In re Wills)*, 243 B.R. 58, 64 (9th Cir. BAP 1999).  The fraudulent

intent "must be actual, not constructive".  *Id.*, citing *In re Devers*, 759 F.2d 751, 753 (9th

Cir. 1985).

In denial of discharge actions, a "debtor's fraudulent intent may be established by

circumstantial evidence or by inferences drawn from his or her  course of conduct."  *Id.*,

citing *Devers*, 759 F.2d at 753-54); *see Farmers Co-Op Ass'n of Talmage, Kan. v. Strunk*,

671 F.2d 391, 395 (10th Cir.1982).  Cases have held that where a debtor gratuitously

conveyed valuable property, the burden shifts to the debtor to prove that his intent was

not fraudulent.  *See Matter of Armstrong*, 931 F.2d 1233, 1239 (8th Cir.1991); *In re*

*Schroff*, 156 B.R. 250, 254 (Bankr. W.D. Mo. 1993); *cf. In re Mascolo* 505 F.2d 274,

276-77 (1st Cir.1974) (debtor's false statement about concealed assets which was never

explained held sufficient to infer fraud).

Section § 727(d)(2) requires that the fraud or knowledge pertain to the failure to report or deliver some property.  *See In re Yonikus*, 974 F.2d at 904-05; 1 Daniel R. Cowans, Bankruptcy Law and Practice § 5.72 at 778 (6th ed. 1994) ("The debtor is required to report to the trustee any property which he receives or becomes entitled to or to deliver it to him. Fraudulent failure to do so is a ground of revocation of the discharge of the debtor.") (footnote omitted) (emphasis added); 4 Collier on Bankruptcy ¶ 727.15[4] at 727-113 (15th ed.1996) ( § 727(d)(2) "imposes a duty upon the debtor to report to the trustee any acquisitions of property subsequent to the filing of the petition."); *cf. Bowman*, 173 B.R. at 925.

The Ninth Circuit wrote, *In re Retz*, 606 F.3d 1189, 1204 (9th Cir. 2010), that a debtor in bankruptcy proceedings has a "duty to share full information with the Trustee." The opportunity to obtain a fresh start is "conditioned upon truthful disclosure."  *Id.*, quoting *Aubrey v. Thomas (In re Aubrey)*, 111 B.R. 268, 274 (9th Cir. BAP 1990) ("Fraudulent intent may be determined by circumstantial evidence").  The Ninth Circuit affirmed that the debtor's failure to inform the trustee of a transfer is circumstantial evidence of intent to hinder, delay or defraud creditors under 727(a)(2) "because there is no other reasonable explanation" for the delay.  *Retz*, 606 F.3d at 1204.  The *Retz* panel also noted that certain "badges of fraud" may support a finding of fraudulent intent under § 727(a)(2).  606 F.3d at 1200;  *Emmett Valley Assocs. v. Woodfield (In re Woodfield)*, 978 F.2d 516, 518 (9th Cir.1992).

These "badges of fraud," not all of which need be present, include:  (1) a close relationship between the transferor and the transferee; (2) that the transfer was in anticipation of a pending suit; (3) that the transferor Debtor was insolvent or in poor financial condition at the time; (4) that all or substantially all of the Debtor's property was transferred; (5) that the transfer so completely depleted the Debtor's assets that the creditor has been hindered or delayed in recovering any part of the judgment; and (6) that the Debtor received inadequate consideration for the transfer.  *Retz*, 606 F.3d at 1200, quoting *Woodfield*.  In this Court's view the same "badges of fraud" may be applied in making a determination of fraudulent intent under § 727(d)(2).

Based on the evidence set forth in detail in the facts section above, this Court finds and concludes that sufficient evidence exists of all six "badges of fraud" sufficient to overcome the liberal construction of § 727(d)(2) in favor of the debtor and strictly against those objecting to discharge.  *See Adeeb*, 787 F.2d at 1342.  The "fresh start" policy of the Bankruptcy Code "limits the opportunity for a completely unencumbered new beginning to the 'honest but unfortunate debtor.'"  *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991).  The evidence in the record set forth above persuade the Court that Franz has not been honest, either with the Trustee or with respect to his disabled brother.

The evidence detailed above shows a close relationship between the transferor Franz and his transferees, including his wife, children, real estate firm where he works, and his brother Brian.  Franz's transfers of his $130,000 one-third inheritance were in

32

anticipation of his pending chapter 7 bankruptcy case. Franz was was insolvent or in poor financial condition at the time of his transfers of the Marcus Place Apartment Sale proceeds, which comprised substantially all of the Debtor's property to be transferred. Franz's transfers of the $130,000 left the Trustee without "a dime" and so completely depleted the Debtor's assets that the Trustee is unable at present to pay administrative expenses or creditors, where before the transfers this would have been a solvent estate. Franz received inadequate consideration for the transfers other than the services he received and his satisfaction of giving money to family members.

In considering whether to infer fraudulent intent, this Court notes that Franz admits to making a "mistake" in not giving his inheritance to the Trustee after conversion. The fact is that Franz made assurances to the Trustee under oath to keep him informed about the sale of the Marcus Place Apartments, but he did not. Instead Franz dissipated the proceeds almost completely. Based on these facts, and after consideration of the "badges of fraud," this Court finds weighty evidence more than sufficient to overcome the liberal construction in favor of the Debtor and strictly against revocation of discharge. *See Adeeb*, 787 F.2d at 1342. The Court finds and concludes, based on inference from "badges of fraud" and Franz's course of conduct, fraudulent intent by Franz. All elements having been proven by a preponderance of the evidence, judgment shall be entered revoking Franz's discharge under § 727(d)(2).

**CONCLUSIONS OF LAW**

33

1.  This Court has jurisdiction under 28 U.S.C. § 1334(b) as this adversary proceeding is arising in and related to the above-captioned Chapter 7 bankruptcy case.

2.  This adversary proceeding to revoke a debtor's discharge is a core proceeding under 28 U.S.C. § 157(b)(2).

3.  The Plaintiff satisfied its burden to show, by a preponderance of the evidence, that the Debtor's discharge should be revoked under 11 U.S.C. § 747(d)(2) for Franz's knowingly and fraudulently failing to report the acquisition of property of the estate, or to deliver or surrender such property to the Trustee.

**IT IS ORDERED** a separate Judgment shall be entered against the Defendant/Debtor Randall A. Franz, in favor of the Plaintiff UST, revoking Franz's discharge under § 727(d)(2).


Honorable Ralph B. Kirscher
Chief U.S. Bankruptcy Judge